THIS
 OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE
 STATE OF SOUTH CAROLINA
 In
 The Court of Appeals

 
 
 
 Premier Holdings, LLC, a Utah Limited Liability Company, and
 Premier Resorts, International, Inc., a Delaware corporation, Respondents,
 v.
 Barefoot Resort Golf Club II, LLC, a South Carolina Limited
 Liability Company, Appellant.
 
 
 

Appeal
From Horry County
 J.
Stanton Cross, Jr., Master-in-Equity

Unpublished
Opinion No. 2008-UP-336
Submitted
June 2, 2008  Filed July 2, 2008

AFFIRMED

 
 
 
 C.
 Mitchell Brown, of Columbia, and Ian S. Ford, of Charleston, for Appellant.
 J.
 Jackson Thomas, of Myrtle Beach, for Respondents.
 
 
 

          PER
 CURIAM: 
 Barefoot Resort Golf Club, II, LLC (Barefoot) appeals inter alia the
 masters finding that it breached a valid contract with Premier Holdings, LLC
 and Premier Resorts, International, Inc. (collectively Premier).  We affirm.[1]
FACTS
Barefoot is owner and
 operator of three golf courses at the Barefoot Resort in North Myrtle Beach, South Carolina.[2] 
 Premier manages large, condominium-resort properties throughout the United States and Mexico and manages properties at the Barefoot Resort.  Legends Barefoot had borrowed
 three million dollars from Premier in July of 2002 to pay for purchasing its
 interest in the courses.  The parties agreed to an extension of the loan in July
 of 2003.  They executed numerous documents in conjunction with the extension of
 the loan.  One of these documents was a Shared Services Agreement (SSA).  The
 SSA provided several benefits to Premier to help ensure the availability of
 golf tee times for clients of Premier.  These benefits included giving Premier
 control of the tee time sheets for Barefoot, blocking certain tee times for
 Premier customers and paying Premier a four percent commission on all golf tee
 times booked by Premier.  
In January of 2005,
 Barefoot took control of the tee time sheets away from Premier.  Premier filed
 suit for breach of contract alleging Barefoot had violated the provisions of
 the SSA.  Barefoot answered alleging the SSA was not an enforceable contract
 because it lacked material terms, specifically, a contract duration.  The
 master-in-equity found the contract was enforceable and the duration of the
 contract was for as long as Premier continued doing business at Barefoot.  The
 master further held Barefoot had breached the SSA and awarded Premier damages
 in the amount of $161,369.  Barefoot appeals.   
STANDARD OF
REVIEW
An action to construe a contract is an action at law.  Likewise, [a]n
 action for breach of contract seeking money damages is an
 action at law. Silver v. Aabstract Pools & Spas, Inc., 376 S.C.
 585, 590, 658 S.E.2d 539, 541-42. (Ct. App. 2008) (quoting R & G
 Constr., Inc. v. Lowcountry Regl Transp. Auth., 343 S.C. 424, 430, 540
 S.E.2d 113, 117 (Ct. App. 2000)).  On appeal from a final judgment of the
 master in a law case tried without a jury, we may not consider the case based
 on our own view of the preponderance of the evidence, but must view the record
 so as to support the masters findings of fact whenever reasonably possible. South Carolina Fed. Sav. Bank v. Thornton-Crosby Dev. Co., 303 S.C. 74, 78,
 399 S.E.2d 8, 11 (Ct. App. 1990) (citing Sheek v. Crimestoppers Alarm Sys.,
 297 S.C. 375, 377 S.E.2d 132 (Ct. App. 1989)).  In other words, we must
 consider the evidence in the light most favorable to the respondent,
 eliminating from consideration evidence to the contrary.  Id. at 79,
 399 S.E.2d at 11.
LAW/ANALYSIS
I.  Enforceability
 of Contract/Duration of Contract[3]
Barefoot
 argues the master erred in finding the SSA to be a valid and enforceable
 contract where material terms were omitted.  We disagree.  
It
 is well settled in South Carolina that in order for there to be a binding
 contract between parties, there must be a mutual manifestation of assent to the
 terms.  Edens v. Laurel Hill, Inc., 271 S.C. 360, 364, 247
 S.E.2d 434, 436 (1978).  Some terms are considered indispensable to a binding
 contract.  Among these are price, time and place.  Id.  However,
 as noted by the master in his order, the requirement of a specific duration for
 the enforcement of a contract is not limited solely to a calendar date, but may
 be provided upon the occurrence of a specific event.  Prestwick Golf Club,
 Inc. v. Prestwick Ltd. Pship, 331 S.C. 385, 392, 503 S.E.2d 184, 187-88
 (Ct. App. 1998).  
Although
 the interpretation of a contract is generally a matter of law, the intent of
 the parties becomes a question of fact . . . when the contract is ambiguous.  Id. at 390, 503 S.E.2d at 187.  An ambiguous contract is a contract capable of
 being understood in more than one way or a contract unclear in meaning because
 it expresses its purpose in an indefinite manner.  HK New Plan Exchange
 Prop. Owner I, LLC v. Coker, 375 S.C. 18, 24, 649 S.E.2d 181, 184 (Ct. App.
 2007).  When a contract is ambiguous, the courts primary objective must be to
 discern the intent of the parties.  Ecclesiastes
 Prod. Ministries v. Outparcel Assocs., 374
 S.C. 483, 497, 649 S.E.2d 494, 501 (Ct.
 App. 2007).  In ascertaining intent, the court will examine the
 totality of the contract and the language used by the parties.  The court will
 also strive to discover the situation of the parties, along with their purposes
 at the time they entered the contract.  Id. at 498, 649 S.E.2d at 502.  In
 arriving at the intention of the parties . . . , the subject matter, the
 surrounding circumstances, the situation of the parties, and the object in view
 and intended to be accomplished by the parties at the time, are to be regarded.  Id. at 499, 649 S.E.2d at 502 (quoting Brady v. Brady, 222 S.C. 242, 246-47, 72  S.E.2d 193, 195
 (1952)).
We agree with the masters finding the duration of the SSA is
 ambiguous as the parties intent is not clearly discernable from the language
 of the SSA.  We believe the testimony in the record reasonably supports the
 masters finding the parties intended the SSA to be in effect for so long as
 Premier was doing business at Barefoot.  Bradley Goulding, part owner and chief
 operating/financial officer of Premier Resorts International, testified Premier
 would not have entered into the loan-extension agreement without the SSA.  He further
 testified Premier was making a long-term investment in the Myrtle Beach area
 and would need the advantages offered by the SSA for as long as they were doing
 business at Barefoot.  Barbara Zimonja, co-owner and president of Premier
 Resorts International, testified she understood the SSA would be in effect as
 long as Premier was in business at Barefoot.  Zimonja also stated Barefoot was
 resistant to allowing Premier to have control of the tee time sheets, but
 eventually Barefoot agreed to the SSA.  
In an e-mail, Thomas Trefor, an attorney acting as general counsel
 for Barefoot at the time the SSA was executed, acknowledged the payoff of the
 loan did not affect the status of the SSA.  He further testified as follows:

 
 Q. Did you have any understanding as to how long the parties
 intended --- Whether they were contractual obligations or not --- how long
 these items mentioned in the Shared Services Agreement were to be enforced?
 A. My understanding was the intention here was that it be in
 perpetuity.  Ill point out, however, that the reason that Barefoot --- or
 actually Larry Young and Danny Young were willing to agree to this provision,
 if it were contractually binding on them, was that they were really obligated
 to do it to Bank of America and, if they had engaged in this business at
 Barefoot, theyd be in default of the seventy-five million dollar loan.
 Q. When you say, in perpetuity, do you mean, in
 perpetuity, or do you mean, perpetuity, so long as Barefoot is in business at
 the beach.
 . . .
 A. The way that its drafted, it would appear to be a claim
 in true perpetuity.  In practice, if Barefoot is no longer in business, it
 becomes unenforceable.  
 

Larry Young, one of the principal owners of Barefoot, admitted
 the SSA was intended to help ensure the availability of golf tee times for
 Premier clients.  It logically follows Premier intended to accomplish this goal
 by having control of the tee time sheets as set forth in Paragraph 3(c) of the
 SSA for as long as they were doing business at Barefoot.
Larry Young and Danny Young, another principal owner in Barefoot,
 testified the SSA was to be re-evaluated periodically to see if it continued to
 be mutually beneficial to both parties.  However, their testimony indicated
 adjustments to the SSA were contemplated primarily with regard to the release
 dates for the blocked tee times.[4]  While Barefoot had little negotiating power in the agreement
 considering the need for the loan extension, they ultimately, and perhaps
 reluctantly, agreed to give control of the tee sheets to Premier.  The
 surrounding circumstances and the testimony in the record support the masters
 finding that the agreement was to last so long as Premier was doing business
 at Barefoot.
II. Barefoots
 Breach of the SSA
Next, Barefoot
 contends the master erred in finding it breached the SSA.  We disagree.  
Barefoots
 argument on lack of breach goes hand in hand with its arguments regarding the
 validity and duration of the SSA.  Barefoot does not deny it took control of
 the tee time sheets.  Barefoot simply contends this action provided notice to
 Premier that Barefoot intended to terminate the SSA.  See Carolina
 Cable Network v. Alert Cable TV, Inc., 316 S.C. 98, 102, 447 S.E.2d 199,
 201 (1994) (holding when no intent can be gleaned from the circumstances
 surrounding a contract, the court will find the contract to be terminable by
 either party given reasonable notice).  However, as previously discussed, we
 find the master did not err in determining the SSA was to be in place so long
 as Premier was doing business at Barefoot.  Consequently, the SSA was not
 terminable at will by either party, and Barefoots actions constituted a breach
 of the agreement.
III. Grant of
 Injunctive Relief
Barefoot also
 appeals the masters issuance of a temporary injunction.  The injunctive order allowed
 Barefoot to retain control of the tee time sheets.  It also prevented Premier
 from booking any tee times outside of its blocked tee times until Premier had
 booked at least eighty-five percent of its blocked tee times.  Finally, the
 order required Barefoot to leave the required tee times blocked until sixty
 days prior at which time the time could be released.  
Upon
 the issuance of the masters final order, the temporary injunction expired
 rendering this issue moot.  Therefore, we decline to address it. See Curtis
 v. State, 345 S.C. 557, 568, 549 S.E.2d 591, 597 (2001) (holding when a is moot).    
IV. Damages
Next, Barefoot
 contends the trial court erred in awarding Premier $161,369 in damages when
 that award was not supported by the evidence.  We disagree.  
Barefoot appears
 to argue because Premier was paid the four percent commission on all tee times
 booked during the breach, Premier suffered no damages.  However, a plaintiff is
 allowed to offer evidence of lost profits so long as the circumstances indicate
 lost profits would have been within the contemplations of the parties at the
 time of the contract.  Drews Co. v. Ledwith-Wolfe Assocs., 296 S.C. 207,
 213, 371 S.E.2d 532, 535 (1988).  In this case, all the parties understood the
 control of the tee sheets would have substantial bearing on the success of
 Premier at Barefoot.  The parties would have also contemplated loss of control
 of the tee sheets would reduce the number of bookings by Premier.  The lost
 profits need not be reduced to a mathematical certainty to be recoverable.  Minter
 v. GOCT, Inc., 322 S.C. 525, 528, 473 S.E.2d 67, 70 (Ct. App. 1996).  However, the
 damages cannot be left to conjecture, guess, or speculation.  Id. 
Here, Premiers
 expert, Robert Mark Woodworth, testified he compared booking trends for Premier
 both pre-breach and post-breach.  He then compared those figures with Premier
 bookings made during the breach when Barefoot had control of the tee time
 sheets.  Woodworth testified he then compared Premiers performance during the
 breach against other similar businesses in the area.  Using all of that data,
 he arrived at the conclusion Premier lost package golf commission income in the
 amount of $79,970 and non-package golf commission in the amount of $89,399.  Woodworths
 testimony established Premiers lost profits to a reasonable degree of
 certainty providing evidence to support the masters award.
V.      Retention
 of Jurisdiction
Finally,
 Barefoot argues the master erred in retaining jurisdiction for the purpose of
 compliance with this Order and with the provisions of the Shared Services
 Agreement, and for determining such issues as may arise thereunder.  This
 issue was not raised to the trial court in its motion to alter or amend the
 judgment.  Therefore this issue is not preserved for our review.  See State v. Dunbar, 356
 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) (holding
 issues not raised and ruled upon in the trial court will not
 be considered on appeal).  
For all of the
 foregoing reasons, the decision of the trial court is 
AFFIRMED.
SHORT
 and KONDUROS, J.J., and CURETON, A.J., concur.

[1] We decide this
 case without oral argument pursuant to Rule 215, SCACR.
[2] Barefoot is equally
 owned by Barefoot Golf Club, LLC and Legends Barefoot, LLC (Legends Barefoot).
[3] We have
 combined Appellants Issues 1 and 2.
[4] Danny Young
 testified he had negotiated with Bradley Goulding for the unbooked blocked tee
 times to be released ninety days in advance so they could be booked through
 other avenues.  However, the SSA contained a sixty-day provision.  Young stated
 Goulding assured him at the signing of the SSA that the timing of the releases
 could be reviewed and adjusted periodically as needed.